## UNITED STATES COURT OF INTERNATIONAL TRADE

```
------------------------------------------------------X
NETJETS AVIATION, INC.,              :
                                     :
    Plaintiff,                       :
                                     :
    v.                               :      No. 21-cv-00142
                                     :
UNITED STATES,                       :
                                     :
    Defendant.                       :
------------------------------------------------------X
```

## COMPLAINT

1. Plaintiff, NetJets Aviation, Inc. ("NJA"), by undersigned counsel, for its Complaint against Defendant, United States, does hereby state and allege as follows:

## JURISDICTION

2. This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(a), as NJA contests the denial by U.S. Customs and Border Protection ("CBP") of its protest brought pursuant to section 515 of the Tariff Act of 1930 ("the Act"), 19 U.S.C. § 1515, and section 174.23 of the CBP Regulations, 19 C.F.R. § 174.23. NJA filed a timely protest on October 7, 2020, docketed with CBP as protest number 2020-9900-00001. On January 19, 2021, NJA requested accelerated disposition of that protest, pursuant to 19 C.F.R. § 174.22(a). More than thirty days have elapsed since that

request, and CBP has not issued a decision on the protest. Accordingly, under 19 U.S.C. § 1515(b), the protest is deemed denied.

3. Pursuant to section 174.31 of the CBP Regulations, 19 C.F.R. § 174.31, and 28 U.S.C. § 2631, this action challenges CBP's finding that NJA collected insufficient amounts of Customs User Fees ("CUF") during calendar year 2016. The CUF is treated as a customs duty for purposes of determining the Court's jurisdiction. 19 U.S.C. § 58c(g)(2).

4. An action may also be commenced in this Court under 28 U.S.C. § 1581(i) "by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." 28 U.S.C. § 2631(i). Section 702 of title 5 provides, in turn, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. 16. NJA is a "person adversely affected or aggrieved" by CBP's determination, and NJA has exhausted the administrative remedies prescribed by statute and regulation.

## STANDING

5. NJA is the protesting party. The basis of the protest was that CBP found NJA was obligated to and failed to collect CUF on certain flights. NJA filed its protest pursuant to section 514 of the Act, 19 U.S.C. § 1514, and section 174.12 of the CBP Regulations, 19 C.F.R. §§ 174.12, and seeks review of that protest pursuant to section 515 of the Act, 19 U.S.C. § 1515, and section 174.23 of the CBP Regulations, 19 C.F.R. § 174.23.

6. This action relates to the same administrative decision that NJA contested in the protest under section 514 of the Act, 19 U.S.C. § 1514 and accordingly, NJA has standing to bring this action under 28 U.S.C. § 2638.

7. There are no liquidated duties, charges, or extractions that plaintiff is currently required to pay regarding the CUF amounts at issue in the protest.

## TIMELINESS

8. CBP notified NJA that the "liquidation date" for the determinations at issue was April 10, 2020. NJA filed its protest on October 7, 2020, pursuant to section 515 of the Act, 19 U.S.C. § 1515, and section 174.23 of the CBP Regulations, 19 C.F.R. § 174.23.

9. Following a request for accelerated disposition, its protest was deemed denied on February 18, 2021, pursuant to 19 U.S.C. § 1515(b) and 19 C.F.R. § 174.22(d).

10. This action is filed within 180 days after the date NJA's protest was deemed to have been denied, and is therefore timely under 28 U.S.C. § 2636(a)(2).

## STATEMENT OF FACTS

### Custom User Fees

11. 19 U.S.C. § 58c, implemented by 19 C.F.R. § 24.22(g), requires a person that "issues a document or ticket to an individual for transportation by a . . . commercial aircraft" for an international arrival into the United States to collect the CUF from the passenger and remit it to CBP.

12. In calendar year 2016, the CUF was $5.50 per arriving passenger. 19 C.F.R. § 24.22(g)(1)(i).

13. The CUF applies only to passengers aboard "commercial aircraft." *See* 19 U.S.C. § 58c (a)(5); 19 C.F.R. § 24.22(g)(4), and the CUF is an obligation of the passenger, not the carrier. The carrier's responsibility is solely to collect the CUF from the passenger and to remit the amount collected. *Am. Airlines, Inc. v. United States*, 551 F.3d 1294 (Fed. Cir. 2008).

14. Neither the statute nor the regulation defines "commercial aircraft," but the meaning of the term is clear from statutory and regulatory context, framed similarly in both. The section 58c(a)(5) fee is imposed on each individual passenger, and a commercial-aircraft user is to collect the fee from the passenger at the time of issuing the ticket. This passenger interaction is so important that the statute specifically requires the ticket to state the fee for the individual passenger. A "commercial aircraft," for purposes of the CUF, means only an aircraft on a flight for which passengers have paid for tickets.

### The NJA Program

15. NJA operates aircraft through fractional aircraft management programs. In these programs, people who want airplanes for their own use, but do not plan to use airplanes full-time, can pool their resources with similarly situated people to share aircraft.

16. Each participant has the right to use a specified fraction of an aircraft's available flight hours, in the form of a corresponding amount of flight time. NJA provides a range of services for the aircraft and the program, such as maintenance and support services, including acquisition of fuel and other supplies, recruitment and scheduling of

pilots, and administrative services such as scheduling space at airports and handling border crossing requirements for international flights.

17. The flights at issue in NJA's protest and this action fell under one of NJA's programs involving aircraft provided by Marquis Jet Partners, Inc. ("Marquis Jet Partners," and the "Program"). Participants purchased the right to use aircraft for specified amounts of flight time (with certain contractual limitations). The purchase represented a substantial investment of hundreds of thousands of dollars for each 25-hour allotment of flight time. The purchase price was paid to Marquis Jet Partners, which did not provide the management services was is not the operator or carrier.

18. In connection with the purchase, NJA operates the aircraft on the participant's behalf. NJA contracts with pilots, handles maintenance and inspection of the planes, secures hangar space, communicates with airports regarding flight plans, etc. The participant remains responsible for the costs specifically associated with his or her use of the aircraft, including the cost of government taxes, duties, fees, and ground transportation. For international flights, a participant might (depending on the origin and destination) pay an additional fee to cover additional costs associated with cross-border travel.

19. During the participant's use of the plane, the participant decides where and when the aircraft flies, subject to Federal Aviation Administration regulations, and who flies on it. To schedule a flight, a participant must tell NJA the origin and destination of the participant's choice, the date and time for takeoff, and the nature and extent of the luggage. A participant is free to change itinerary (subject to certain limitations). A

participant need give only brief advance notice to schedule a flight, typically 48 hours for an international flight.

20. A participant can bring as many or as few guests as he or she chooses, up to the maximum that the aircraft can physically accommodate. Participants promise not to sell seats or take compensation for inviting guests. NJA cannot fill empty seats by adding its own passengers.

21. NJA has limited to no interaction with the participant's guests prior to boarding. It does not communicate with them, issue them documents, or obtain payments from them. A participant must provide NJA the names of the participant's guests and other identity information, so that NJA can check their names against sanctions lists, prepare a flight manifest and share relevant information with the Transportation Security Administration and CBP. Flight crew also use that information to verify the guests' identities at boarding.

22. CBP charges an annual fee for private aircraft arriving to U.S. airports from abroad.

23. NJA has historically treated the aircraft at issue in this matter, and the flights at issue, as private aircraft, and regularly remits the annual private-aircraft fee to CBP for the aircraft in this program.

**The Audit**

24. CBP undertook audits of NJA's remission of various fees during calendar year 2016. NJA cooperated fully with the audits and responded to multiple information requests from the auditor.

25. The auditor indicated that he believed a number of flights conducted by NJA were commercial flights for purposes of the CUF, and that NJA was obligated to collect the CUF for those flights. The audit report provided no explanation, beyond stating that the information provided by NJA "does not support private operations."

26. The flights at issue were generally within the program described above. The auditor concluded that NJA failed to collect and remit fees from individual passengers on the flights, and calculated a total amount of missing CUF based on a specific set of flights and passenger counts.

27. NJA objected, and provided arguments to the contrary. It stated that the flights at issue were private aircraft, not commercial aircraft within the meaning of the CBP Regulations and the statute, and were directed by private parties using the aircraft for their own purposes. It also provided documents demonstrating it had paid the full fees necessary on its understanding that the aircraft at issue are private, not commercial, aircraft.

28. Nearly four years after starting the audit, the auditor issued a draft report in February 2020, bearing number 331-16-UF1- UF-25580. In mid-April, CBP sent NJA a letter stating CBP had finalized the findings. Consistent with the *American Airlines* principle that a carrier does not actually owe amounts of CUF it has not collected, the letter stated that the amount NJA owes directly is zero. The letter also stated that April 10, 2020 was the "liquidation date" for the audit reports and that NJA could protest the audit findings under 19 C.F.R. § 174.12. As previously indicated, NJA proceeded to do so.

29. In April, CBP also sent NJA notices of liquidated damages, asserting that under the terms of its international carrier bonds and 19 C.F.R. § 113.64(b), NJA must pay as liquidated damages twice the amount of the CUF that it was obligated to but did not collect. NJA timely petitioned for cancellation or mitigation of those notices, pursuant to 19 C.F.R. part 172. The petition remains pending under consideration by CBP. Under the terms of the notices, no payment is currently due.

## STATEMENT OF CLAIMS

30. CBP's determination that the aircraft at issue in the audit report are "commercial" was contrary to law, arbitrary and capricious, and not supported by substantial evidence.

31. CBP's audit report made no attempt to interpret the statute governing the CUF, 19 U.S.C. § 58c, or the regulation implementing the CUF, 19 C.F.R. § 24.22(g). CBP relied on a different regulation that explicitly does not apply in this context, and an unrelated statute that is significantly different. Properly understood, the CUF applies only for a flight on which tickets are sold to passengers. NJA did not sell tickets to passengers for the disputed flights, and the private persons directing the flights are barred from selling tickets or charging their guests.

32. Even when an aircraft is commercial, both the statute and previous CBP interpretations make clear that the duty to collect the CUF falls on the person that issues the tickets to passengers. CBP did not determine whether NJA issued tickets to passengers for the disputed flights. In fact, NJA did not issue tickets to passengers.

33. All of the disputed flights involve aircraft that qualify as private for purposes of the CUF. The aircraft were not "commercial" for purposes of section 58c, and NJA properly paid the necessary private-aircraft fees. Even if the flights had been commercial, NJA had no obligation to collect CUF because it did not issue tickets or travel documents to passengers.

## COUNT I

### NJA Was Not Obligated to Collect CUF for the Disputed Flights

34. The foregoing paragraphs are hereby repeated and re-alleged.

35. CBP has demanded that NJA pay the CUF which it asserts is due because NJA operated flights that a CBP auditor said, without analysis, were commercial.

36. CBP's demand for payment demonstrates that CBP has taken the position that the flights in question were commercial within the meaning of the CBP regulations, and that NJA was required to collect CUF for the flights.

37. NJA was not obligated to collect the CUF on those flights. NJA is injured by CBP's determination to the contrary, because (among other reasons) that determination was the basis of CBP's notice of liquidated damages.

38. NJA has exhausted the administrative process for its claims.

39. The flights in question were not commercial within the meaning of the CBP regulations. NJA did not issue tickets or other travel documents to individuals travelling on the flights. NJA simply provided management and operational services for the private flights directed by individual program participants.

40. For these reasons, and for others that may be discovered through this litigation, CBP's decision in protest number 2020-9900-00001 was arbitrary and capricious, contrary to law, and not supported by substantial evidence; and the underlying report, number 331-16-UF1-UF-25580, was inaccurate.

41. NJA requests judgment reversing or vacating CBP's denial of its protest and determining that NJA was not obligated to collect and remit the CUF for the disputed flights.

## **PRAYER FOR RELIEF**

WHEREFORE, NJA respectfully requests that this Court provide the following relief:

(1) Declare and determine that CBP's decision, that NJA was obligated to collect CUF for the flights at issue, was arbitrary and capricious, contrary to law, and not supported by substantial evidence;

(2) Vacate CBP's decision that the flights at issue incurred the CUF, and remand the matter for further appropriate action consistent with the Court's judgment;

(3) Award reasonable costs and attorneys' fees, to the extent permitted by applicable law;

(4) Grant such other and further relief as the Court concludes is appropriate.

Respectfully submitted this 26th day of March, 2021.

    */s/ Keith Bradley*
Keith Bradley
ScheLeese Goudy
SQUIRE PATTON BOGGS (US) LLP
1801 California Street, Suite 4900
Denver, CO 80202
(303) 830-1776
(303) 894-9239 (facsimile)
keith.bradley@squirepb.com
scheleese.goudy@squirepb.com

*Counsel for Plaintiff*