## UNITED STATES COURT OF INTERNATIONAL TRADE

------------------------------------------

NETJETS AVIATION, INC.,       :
                              :
    *Plaintiff/Counterclaim-Defendant*,   :
                              :          Before: Claire R. Kelly, Judge
    *v.*                       :          No. 21-cv-00142
                              :
UNITED STATES,                :
                              :
    *Defendant.*               :

------------------------------------------

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

I.      BACKGROUND.................................................................................................... 2

        A.      NJA Provides Operational Services for Private Flights Directed by
                Others..................................................................................................... 2

        B.      NJA Did Not Collect and Did Not Remit CUF for the Marquis Flights........... 5

        C.      NJA Has Properly Disputed the Demand for CUF. ............................................ 8

II.     JURISDICTION................................................................................................... 9

III.    STANDARD OF REVIEW ................................................................................. 11

IV.     ARGUMENT:  NJA IS ENTITLED TO SUMMARY JUDGMENT REGARDING
        ITS PROTEST .................................................................................................... 12

        A.      The Customs User Fee Statute and Regulation Preclude Treatment of
                the Marquis Flights as Commercial. .................................................... 16

                1.      The text and structure of section 58c unambiguously do not
                        encompass these flights as "commercial." ............................................ 16

                2.      The CUF regulation unambiguously does not encompass these
                        aircraft as "commercial."......................................................... 20

                3.      Interpreting section 58c(a)(5) to cover the Marquis flights
                        would be unreasonable.................................................... 24

        B.      CBP's Audit Improperly Relied on an Unrelated Definition of
                "Commercial" Status. ............................................................ 29

V.      ARGUMENT:  THE COURT SHOULD DISMISS THE GOVERNMENT'S
        COUNTERCLAIM............................................................................................. 33

VI.     ARGUMENT:  IF THE COURT DECIDES THE MERITS OF THE
        GOVERNMENT'S COUNTERCLAIM, IT SHOULD GRANT SUMMARY
        JUDGMENT TO NJA.......................................................................... 36

VII.    CONCLUSION ...................................................................... 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Airlines, Inc. v. United States,*
  551 F.3d 1294 (Fed. Cir. 2008) .................................................................. 6, 19

*Amcor Flexibles Kreuzlingen AG v. United States,*
  No. 16-00193, 2022 Ct. Int'l Trade LEXIS 15 (Feb. 22, 2022) ................... 12

*Anhydrides & Chems. v. United States,*
  130 F.3d 1481 (Fed. Cir. 1997) ..................................................................... 11

*BASR P'ship v. United States,*
  915 F.3d 771 (Fed. Cir. 2019) ...................................................................... 16

*Bay Cnty., Fla. v. United States,*
  796 F.3d 1369 (Fed. Cir. 2015) .................................................................... 16

*Cormorant Shipbuilding Co. v. United States,*
  33 C.I.T. 440 (2009) .................................................................................... 36

*DaimlerChrysler Corp. v. United States,*
  442 F.3d 1313 (Fed. Cir. 2006) ..................................................................... 9

*Epoch Design LLC v. United States,*
  36 C.I.T. 26 (2012) ........................................................................................ 9

*Falconwood Corp. v. United States,*
  422 F.3d 1339 (Fed. Cir. 2005) .................................................................... 32

*Home Depot U.S.A., Inc. v. Jackson,*
  139 S. Ct. 1743 (2019) ................................................................................. 34

*JBLU, Inc. v. United States,*
  813 F.3d 1377 (Fed. Cir. 2016) ................................................................... 20

*Nat'l Cable Television Ass'n v. United States,*
  415 U.S. 336 (1974) ..................................................................................... 25

*PDS Consultants, Inc. v. United States,*
  907 F.3d 1345 (Fed. Cir. 2018) ................................................................... 18

**TABLE OF AUTHORITIES**
(continued)

Page

*Playhouse Import & Export v. United States,*
    18 C.I.T. 41 (1994) ................................................................. 34

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.,*
    672 F.3d 1041 (Fed. Cir. 2012)............................................. 35

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    566 U.S. 560 (2012) ............................................................. 16

*United Steel & Fasteners, Inc. v. United States,*
    947 F.3d 794 (Fed. Cir. 2020)............................................. 23

*Util. Air Regulatory Grp. v. EPA,*
    573 U.S. 302 (2014) ............................................................. 18

*Vt. Dep't of Natural Res. v. United States ex rel. Stevens,*
    529 U.S 765 (2000)............................................................... 30

*Yates v. United States,*
    574 U.S. 528 (2015)........................................................16, 17

**Statutes**

8 U.S.C. § 1356 .................................................................... 16, 19

19 U.S.C. § 58c ..........................................................................*passim*

19 U.S.C. § 58c(a) .....................................................................*passim*

19 U.S.C. § 58c(d) .....................................................................*passim*

19 U.S.C. § 58c(e) ..............................................................14, 16, 25

19 U.S.C. § 1514(a) ....................................................................... 9

19 U.S.C. § 1515(b) .................................................................8, 10

28 U.S.C. § 1367 .......................................................................... 35

28 U.S.C. § 1441 .......................................................................... 34

28 U.S.C. § 1581(a) ....................................................................... 9

28 U.S.C. § 1582(2) ................................................................33, 34

**TABLE OF AUTHORITIES**
(continued)

**Page**

28 U.S.C. § 1583 .................................................................................................35

28 U.S.C. § 1585 .................................................................................................35

28 U.S.C. § 2636(a) ............................................................................................10

28 U.S.C. § 2638(2) ............................................................................................11

28 U.S.C. § 2640(a)(1) .......................................................................................11

## Other Authorities

9 C.F.R. § 97.1(a)(1) ...........................................................................................26

14 C.F.R. § 91.321 ................................................................................................5

19 C.F.R. § 4.80a ...............................................................................................31

19 C.F.R. § 24.16(c) ...........................................................................................26

19 C.F.R. § 24.22 ..........................................................................................*passim*

19 C.F.R. § 113.64(b) ....................................................................................36, 37

19 C.F.R. § 113.64(b)(1) ...........................................................................6, 8, 10, 11

19 C.F.R. § 122.1 ..........................................................................................*passim*

19 C.F.R. § 122.14 .............................................................................................33

19 C.F.R. § 122.61(a) .........................................................................................32

19 C.F.R. § 171.0 ...............................................................................................35

19 C.F.R. § 174.22(d) ...........................................................................................8

19 C.F.R. § 175.0 ...............................................................................................35

51 Fed. Reg. 21,152 (June 11, 1986) ...................................................................30

58 Fed. Reg. 54,271 (Oct. 21, 1993) .............................................................*passim*

80 Fed. Reg. 70,154 (Nov. 13, 2015) ..................................................................37

**TABLE OF AUTHORITIES**
(continued)

**Page**

Cambridge Dict.,
    https://dictionary.cambridge.org/us/dictionary/english/commercial ............................ 17

Congress established a fee (the "Customs User Fee" or "CUF") for international commercial airline passengers.  19 U.S.C. § 58c.  The fee is collected by the person that issues a ticket to a given passenger, and remitted by that person.  *Id.* § 58c(d)(1). Meanwhile, no statute or regulation imposes the CUF on a carrier, or obligates a carrier to collect CUF in the absence of tickets or similar travel documents.  Plaintiff NetJets Aviation, Inc. ("NJA") provides operational services to persons who choose where and when to fly for their own private purposes, and who invite as many or as few guests as they please.  Nobody issues those guests with tickets or other documents, and certainly NJA does not.  Yet U.S. Customs and Border Protection ("CBP") insists that NJA was required to collect CUF from the guests anyway, and then to remit the collected CUF.  The only basis for that demand appears to be a different regulation, with a different meaning and scope.  And CBP's demand is contrary to the plain text of the CUF statute.  NJA asks this Court to determine that NJA was not obligated to collect CUF for the flights at issue.

The government has raised a counterclaim based on its demands for liquidated damages for NJA's failure to collect the disputed CUF.  The Court does not have jurisdiction over that counterclaim and should dismiss it.  If the Court does decide to adjudicate the counterclaim, the Court should grant NJA summary judgment on the counterclaim, because NJA was not obligated to collect CUF on these flights in the first place.

## I.   BACKGROUND

### A.   NJA Provides Operational Services for Private Flights Directed by Others.

NJA provides a range of services for aircraft owners. It takes care of the aircraft—maintenance, hangaring, inspection, etc.—for owners who want the benefits of aircraft ownership but find it convenient to retain a service provider to take care of the planes. Ex. A., Declaration of Kiesha Schirner ("Schirner Decl."), ¶ 4; ECF No. 23, at 9 ¶ 21 (CBP's counterclaim) ("Counterclaim").  NJA also serves as operator of record, for purposes of Federal Aviation Administration ("FAA") regulations.  Schirner Decl., ¶ 4.  The FAA requires a person flying an aircraft to register the aircraft, to prepare a flight plan before each trip, to document the maintenance and inspection of the aircraft, to document the qualifications of the individuals flying the plane, and more.  These tasks, too, NJA carries out for the owners it works with.  *Id*; Counterclaim, ¶ 21.  NJA arranges pilots and crew for the airplanes, and NJA registers as the operator of the airplanes and handles flight plans and the like.  *Id.*  The overall service is that an airplane's owner can decide where and when to fly, and instead of having to contract for each of the many activities and supplies involved in the flight (buying fuel, arranging hangar space, and so on), an owner can contract with one party, NJA, which handles those tasks.  Schirner Decl., ¶¶ 4-7.

For many of the aircraft that NJA manages, t█████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████*d*., ¶ 3.  These fractional owners contract with NJA in the same way as whole owners would; but of course a fractional owner does not have the sole right to direct the airplane (the other owners also

have their rights), and instead gets to use the airplane only the proportionate share of the available flight time. *Id.*

Some people want to use an airplane for only a smaller amount that would make actual ownership, even on a fractional basis, impracticable. *Id.*, ¶ 5. These people obtain the right to fly a certain type of aircraft for a specified number of hours, rather than having a specific ownership interest. *Id.* T█████████████████████████████████ ███████████████████████████████████hat entity has been renamed, but for convenience this brief calls the program the "Marquis program," and the flights that participants take will be called "Marquis flights.") Schirner Decl., ¶ 5-6. ██████████████████████████████ *Id.*, ¶ 5; Ex. B, Declaration of Julie Grunenwald ("Grunenwald Decl."), ¶ 3. NJA provides the same sorts of services for the program participants as for aircraft owners. Schirner Decl., ¶¶ 4-6. The contracts governing a program participant's relationship with Marquis and with NJA are Exhibits A1 and A2. *Id.*, ¶ 6.

A Marquis program participant has the right to direct an aircraft, to and from anywhere the participant chooses and at any time the participant chooses. Schirner Decl., ¶¶ 7-8. This right is subject to certain sensible limitations, such as applicable law restricting travel to or from certain locations. Schirner Decl., ¶ 7. ████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.*, ¶ 8; Ex. A1, § 3(a). T██████████████████████████████████████ █████████ Grunenwald Decl., ¶ 4. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Grunenwald Decl., ¶¶ 4-5; Ex.

C., Declaration of Hassan Sahardid ("Sahardid Decl."), ¶ 5; Ex. A1, § 5; Ex. A2, § D.2.

Be███████████████████████████████████████████████████

████████████████████████████████████████ Sahardid Decl., ¶ 9; Ex.

A1. ███████████████████████████████████████████████████

█████████████████████████████████████████████████████.

Grunenwald Decl., ¶ 6; Sahardid Decl., ¶ 6. ████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ Sahardid Decl., ¶ 9.

A participant can bring guests on a flight. Schirner Decl., ¶ 10. Those guests could

be as many or as few as the participant wants, subject to the physical capacity of the

aircraft. *Id.* They could be anyone the participant might invite (subject to restrictions

imposed by law, such as bars on entry to the United States). *Id.* NJA has no

communication with these guests prior to boarding, except that a participant can

designate a lead guest for flight-related information, if the participant is not actually

flying on that flight with guests. *Id.*, ¶¶ 11-12. ██████████████████████

█████████████████████████████████████████████████████

█████████████████████████ *Id.* NJA does not issue any documents to guests; and

indeed it has no mechanism for issuing any documents to them, because it has no

communication with them. *Id.*; Ex. A5; Ex. A6. Boarding passes, in the form the Court is

likely familiar with for airline travel, are not necessary, because the flights take off and

4

land from the general (i.e. private) aviation areas of airports.  NJA does have the basic

identity information for guests, so it can verify they are not subject to legal restrictions

and so it can forward their information to the Transportation Security Administration

("TSA") and CBP for screening.  Schirner Decl., ¶ 10.

Participants ca ███████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████t

These Marquis program flights, during calendar year 2016, are the genesis of the

current dispute. A list of the Marquis flights during 2016 is at Exhibit D.

### B.    NJA Did Not Collect and Did Not Remit CUF for the Marquis Flights.

CBP administers a fee, the CUF, for passengers traveling on ticketed international

commercial flights.  What marks a flight as "international" may vary depending on the

regulatory context, but so far as NJA is aware the parties are agreed that the flights listed

in Exhibit D were international within the meaning of the CUF statute and regulations.

The CUF is established by statute.  19 U.S.C. § 58c.  "[T]he Secretary of the Treasury

shall charge and collect the following fees . . .  for the arrival of each passenger aboard a

commercial vessel or commercial aircraft from a place outside the United States . . ., $ 5."

*Id.* § 58c(a)(5)(A).  In calendar year 2016, the CUF was $ 5.50 per arriving passenger.  19

C.F.R. § 24.22(g)(1)(i); ECF No. 20, ¶ 11 (operative complaint)("1AC"); ECF No. 23, ¶ 11

("Answer") (admitting this allegation).  "Each person that issues a document or ticket to

---

[1] The cited clause identifies two exceptions. O█████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

an individual for transportation by a commercial vessel or commercial aircraft into the customs territory of the United States shall . . . (A) collect from that individual the fee charged under subsection (a)(5) at the time the document or ticket is issued; and (B) separately identify on that document or ticket the fee charged under subsection (a)(5) as a Federal inspection fee." *Id.* § 58c(d)(1). A person collecting CUF is required to remit the collected fees to CBP on a quarterly basis. *Id.* § 58c(d)(3). The Federal Circuit has held that if a company has not collected fees of this sort, it is not required to pay the government the amounts that it should have collected. *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1301 (Fed. Cir. 2008).[2] Fees of this type are responsibilities of the passengers, and the operator is solely the collection agent. *Id.* But CBP regulations mandated that NJA maintain a surety bond, under the terms of which, if a carrier "fails to pay [CUF]" timely after the fees "were required to be collected," the carrier must "agree to pay liquidated damages equal to two times the [CUF] . . . that [was] required to be collected . . . regardless of whether such fees were in fact collected from passengers." 19 C.F.R. § 113.64(b)(1). In other words, despite *American Airlines*, a section 113.64 bondholder must pay twice the amount of CUF that it was required to but failed to remit, even if the bondholder did not actually collect the CUF from passengers in the first place.

NJA did not collect the CUF for the Marquis flights, and it did not remit amounts corresponding to the CUF for those flights. Schirner Decl., ¶ 15; Grunenwald Decl., ¶ 7.

---

[2] The *American Airlines* case involved two other fees, one imposed by the U.S. Department of Agriculture and one that was formerly imposed by Immigration and Naturalization Service but is currently administered by CBP. The court did not formally speaking address the CUF. But CBP has taken a similar position about the CUF. *See User Fee for Customs Services*, 58 Fed. Reg. 54,271, 54,279 (Oct. 21, 1993) ("[T]he intent of Congress was that the passenger . . . pay the fee.").

Instead, NJA has routinely paid certain fees that are imposed for private aircraft. Schirner Decl., ¶ 14; *see* 19 U.S.C. § 58c(a)(4) (private-aircraft fee).

In 2016, a CBP auditor initiated a review of NJA's remissions of CUF during 2016. Counterclaim, ¶ 26.  The auditor requested documents, engaged in a site visit to NJA, and engaged in questions and answers with NJA.  Sahardid Decl., ¶ 3; IAC, ¶ 23; Answer, ¶ 23 (admitting that NJA responded to multiple requests for information); *see also e.g.* Ex. F., Certification of Orest Panchuk ("Panchuk Certification");[3] Ex. F10; Ex. F11.  ███████████

████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ The audit did not conclude until March 2020.  IAC, ¶ 27; Answer, ¶ 27. ████████████████████████

████████████████████████████████████████████anchuk

Certification; Ex. F1, at AR_CBP_000060.  ████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

---

[3] Exhibits attached to the Panchuk Certification are CBP's records from the audit, which Orest Panchuk, Assistant Field Director for Regulatory Audit and Agency Advisory Services, certified as such.

## C.   NJA Has Properly Disputed the Demand for CUF.

CBP then sent NJA a letter advising a protest could be filed under CBP's part 174

protest procedures.  Panchuk Certification; Ex. F8.  ███████████████████████

████████████████████████████████████████████████████ presumably

on account of the *American Airlines* holding that a company that has not collected CUF has

no obligation to remit anything.

On April 17, 2020, CBP sent NJA four notices bearing the title "Notice of Penalty or

Liquidated Damages Incurred and Demand for Payment."  ECF No. 23-2, Counterclaim,

Exhibit 2.  Each of these notices corresponded to a calendar quarter of 2016.  █████████

███████████████████████ pursuant to 19 C.F.R. § 113.64(b)(1), █████████████

██████████████████████████████████████████████████████

████████  *Id.*  The notices also explained that NJA had a right to petition for relief from the

demand, within 60 days of the date of the notices.  *Id.*

On June 16, 2020, NJA petitioned for cancellation of the liquidated damages

notices.  Bradley Decl., ¶ 3; Ex. E2; Counterclaim, ¶ 34.  This petition remains pending for

decision.

On October 7, 2020, NJA filed a protest of the audit report, pursuant to the

liquidation letter noted above.  ECF No. 14-1; Bradley Decl., ¶ 4; Ex. E3; *See also* 1AC, ¶ 7

(alleging the filing of the protest); Answer, ¶ 7.  The protest is Number 2020-9900-00001.

Ex. E4.

NJA then requested accelerated disposition pursuant to 19 U.S.C. § 1515(b) and 19

C.F.R. § 174.22(d).  1AC, ¶ 8; Answer, ¶ 8.  CBP did not decide the protest by 30 days after

the request, and the protest was accordingly deemed denied on February 18, 2021.  IAC,

¶ 8; Answer, ¶ 8.

## II.    JURISDICTION

This Court has exclusive jurisdiction over this action, because it is a contest of

CBP's denial of a protest under section 515 of the Tariff Act.  28 U.S.C. § 1581(a).  A dispute

over the obligation to collect and remit CUF is not a traditional duties matter.  But it is

within the proper scope of section 515 and section 514 protests.  Section 514 of the Tariff

Act allows protests regarding "all charges or exactions of whatever character within the

jurisdiction of the Secretary of the Treasury."  19 U.S.C. § 1514(a).  The CUF is within that

scope:  Section 58c(g) authorizes the Secretary of the Treasury to "prescribe such rules and

regulations as may be necessary" to implement the CUF, and further states that "all

administrative and enforcement provisions of customs laws and regulations . . ., shall

apply with respect to" the CUF "as if such fee is a customs duty."  *Id.* § 58c(g).  Section 515,

in turn, calls for CBP to decide any protest that has been properly filed under section 514.

Thus, the auditor's determination that NJA was required to collect CUF on the Marquis

flights was properly the subject of a section 514 protest, just as CBP's letter advised; and

the denial of that protest is properly the subject of an action within 28 U.S.C. § 1581(a)

jurisdiction.

NJA has fulfilled the prerequisites for that jurisdiction.  *See DaimlerChrysler Corp. v.*

*United States*, 442 F.3d 1313, 1319 (Fed. Cir. 2006) (noting that the filing of a protest is a

jurisdictional requirement); *Epoch Design LLC v. United States*, 36 C.I.T. 26, 30 (2012) (all

"liquidated duties, charges, or exactions" must be paid at the time of filing) (citing 28

U.S.C. § 2637(a)).  NJA timely filed protest Number 2020-9900-00001.  *See* ECF No. 14-1

(CBP's filing of protests); Ex. E3; IAC, ¶ 39 (identifying the protest by number); IAC, ¶ 7 (alleging filing of the protest on October 7, 2020, after a liquidation date of April 10, 2020); Answer, ¶ 7 (admitting those facts). The protest was deemed denied, by operation of 19 U.S.C. § 1515(b), on February 18, 2021. IAC, ¶ 8 (alleging request for expedited treatment); Answer, ¶ 8 (admitting those facts); Ex. L. NJA filed this action on March 26, 2021, well within the deadline of 180 days after the denial of the protest. ECF No. 1; 28 U.S.C. § 2636(a) (180-day deadline).

No outstanding duties, charges, or exactions related to the protest were due and unpaid at the time of the filing. As noted above, NJA owed zero in remissions of CUF for the 2016 Marquis flights, because it had not collected any CUF; and CBP's liquidation letter accordingly stated that NJA owed zero. Ex. F8; IAC, ¶ 6; Answer, ¶ 6 (admitting there are no liquidated duties, charges, or exactions that NJA is currently required to pay). NJA did receive notices of liquidated damages. Each of them stated a "time limit for payment *or* filing petition for relief." ECF No. 23-2, Counterclaim, Exhibit 2 (formatting altered). That time limit was 60 days from the date on the notices, April 17, 2020. *Id.* NJA filed a petition for relief from all the notices, on June 16, 2020. Bradley Decl., ¶ 3; Ex. E2; Counterclaim, ¶ 34. Accordingly, NJA fulfilled the time limit specified in the notices, and has no obligation to pay the demand until CBP has acted on the petition for relief.

NJA has standing to contest the denial of its protest. Although NJA owes no direct payments of CUF despite the audit finding, the sole basis of CBP's liquidated damages demands against it was the section 113.64(b)(1) condition noted above—that NJA must pay twice the amount of CUF it was required to collect, even if it did not collect.

Counterclaim, pp. 6-7 ¶¶ 4, 7 (government's counter-claim, alleging that NJA had agreed to that condition); ECF No. 23-2, Counterclaim, Exhibit 2 (reciting section 113.64(b)(1) as the grounds for liquidated damages).  Thus, CBP demanded those liquidated damages because it believed NJA was obligated to collect CUF; and by the terms of the regulation governing the bond conditions, the liquidated damages can only apply if indeed NJA was obligated to collect CUF for the flights at issue.  The audit conclusion has caused NJA concrete injury by subjecting NJA to the liquidated damages demands; and a decision by the Court that NJA was not obligated to collect CUF will automatically lead to the termination of those demands.

The Court does not have jurisdiction over the government's counterclaim, for the reasons explained below.

## III.   STANDARD OF REVIEW

The Court decides the matter *de novo*, on the basis of the record made by the parties in court; and the Court may consider any new ground in support of NJA's claims so long as the new ground "is related to the same administrative decision," i.e. the protest under appeal.  28 U.S.C. §§ 2640(a)(1); 2638(2).  CBP's decision carries a presumption of correctness, but only in the sense that NJA bears the burden to prove the audit finding was incorrect.  *Id.* § 2639(a)(1).  CBP does not receive deference regarding its factfinding or *Chevron* deference regarding its statutory interpretations in the course of the protest. *Anhydrides & Chems. v. United States*, 130 F.3d 1481, 1486 (Fed. Cir. 1997).

The Court "will grant summary judgment when 'the movant shows that there is no genuine dispute as to any material fact [such that] the movant is entitled to judgment as a matter of law.'"  *Amcor Flexibles Kreuzlingen AG v. United States*, No. 16-00193, 2022 Ct. Int'l

Trade LEXIS 15, *8 (Feb. 22, 2022) (quoting USCIT R. 56(a)).  "To raise a genuine issue of material fact, a party cannot rest upon mere allegations or denials and must point to sufficient evidence for the claimed factual dispute so as to require resolution at trial." *Id.* at *8-9.

## IV.   ARGUMENT:  NJA IS ENTITLED TO SUMMARY JUDGMENT REGARDING ITS PROTEST.

The key facts are indisputable.  NJA provides a range of services to enable a Marquis program participant to take a flight; those services include, among others, maintaining the planes, procuring fuel, and providing the flight crew.  Schirner Decl., ¶ 4; Counterclaim, ¶ 21.  A program participant has full authority to determine where and when a flight goes, cabined only by the availability of aircraft, by minimal requirements to provide enough notice of the flight plans, and by government restrictions on flights to or from particular airports.  Schirner Decl., ¶¶ 7-9.

A participant can bring as many or as few guests as the participant chooses.  *Id.*, ¶ 10. ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████  NJA does not interact with a participant's guests; and NJA has no obligation to the guests.  Schirner Decl., ¶¶ 10-11.  (If a participant decided at the last minute to disinvite a guest, NJA would have no say in the matter, and the guest would have no recourse against NJA.  *Id.*)  And, in line with these arrangements, NJA does not issue tickets or other travel documents to a participant's guests, and does not charge fees of any nature to those guests.  *Id.*, ¶ 11.  The auditor did not see any tickets

or travel documents for the Marquis flights, because none existed a ███████████

███████████████████

NJA does not collect CUF from program participants or their guests, and it does

not have a way to do so.  *Id.*, ¶ 15; Ex. A5; Ex. A6.  ███████████████

███████████████████████

Grunenwald Decl., ¶ 4; Sahardid Decl., ¶ 5.  ████████████████

███████████████████████

████████████████████ Sahardid Decl., ¶¶ 6, 9;

Grunenwald Decl., ¶ 6; Ex. A1.  ████████████████

████████████████ Grunenwald Decl., ¶ 6; Panchuk Certification; Ex.

F2, at AR_CBP_000402.

Given these facts, under a proper interpretation and application of the CUF statute

and regulation, the Marquis flights did not incur CUF; and at a minimum NJA had no

obligation to collect it.  The CUF statute explicitly says that CUF applies only when a

ticket is issued to a passenger, and (as elaborated below) CBP has for years consistently

maintained that position as well.  Yet CBP now insists that NJA must collect CUF from

individuals who receive no tickets or other travel documents—because they are not

paying for their flights and have no right to travel on the flights, and the only people who

control whether those individuals can fly are inviting them for personal reasons, without

compensation.  CBP's demands are contrary to the plain text and to any reasonable

interpretation of the pertinent authorities.

The CUF statute imposes a fee "for the arrival of each passenger aboard a . . . commercial aircraft." 19 U.S.C. § 58c(a)(5). Any determination of what makes an aircraft "commercial" for purposes of section 58c must begin with the statute, and then with the regulation that CBP issued to implement the statute, 19 C.F.R. § 24.22(g). Neither the statute nor the regulation defines "commercial aircraft," but its meaning is clear from statutory and regulatory context, framed similarly in both. The section 58c(a)(5) fee is imposed on each individual passenger, and a commercial-aircraft user is to collect the fee from the passenger at the time of issuing the ticket.

This ticketing interaction is so important that the statute specifically requires the ticket to state the fee for the individual passenger. 19 U.S.C. § 58c(d)(1)(B). NJA did not issue tickets, sell passage, or even communicate pre-flight with the guests that program participants brought on Marquis flights. Schirner Decl., ¶ 11. The participants also did not sell tickets or issue travel documents. Ex. A2, ¶ B.2. These arrangements are simply private flights by the program participants, bringing whatever friends, family, or other guests they please. These characteristics, in light of how the statute and regulation are written, qualify the aircraft as private rather than "commercial" for CUF purposes.

Even if section 58c and section 24.22(g) were ambiguous (they are not), it would be unreasonable to interpret them to include the Marquis Program aircraft as "commercial aircraft." Section 58c(a)(5) represents Congress's bargain with commercial aircraft operators: Operators can maximize passenger and flight volume, as they are incentivized to do through the sale of tickets, and CBP charges passengers the subsection (a)(5) fee to fund services commensurate with commercial passenger traffic, at no additional cost to

airlines.  *See* 19 U.S.C. § 58c(e) (requiring CBP to provide customs services for scheduled airlines "when needed and at no cost" other than the CUF, and for "charter air carriers" with no cost other than CUF and limited overtime costs).   NJA is not a scheduled airline and not a charter air carrier.  Bradley Decl.; Ex. E1; Ex. E5.  And, unlike commercial aircraft operators, the participants in the Marquis Program have no incentive to add passengers to their flights, or to maximize the number of flights they fly on.  Like any other private aircraft owner, their use of airports and customs services are sporadic and minimal relative to commercial airlines and aircraft.  NJA also cannot sell or fill empty seats.  Schirner Decl., ¶ 10.  It does not generate large batches of passengers, as typical airline flights do, and does not strain CBP resources in a comparable manner to commercial aircraft.   Congress did not intend the subsection (a)(5) per-passenger fee to apply to such use.

CBP's audit report relied on the definition of "commercial aircraft" in 19 C.F.R. § 122.1(d) to determine the Marquis "flights" were commercial aircraft for purposes of section 58c and its implementing regulation, 19 C.F.R. § 24.22(g).  But section 122.1 does not implement section 58c, and section 122.1(d) expressly does not apply to section 24.22. In fact, in adopting section 24.22(g), CBP chose to incorporate by reference another definition from section 122.1, but not the definition of "commercial aircraft." Therefore, looking to section 122.1(d) to delineate "commercial aircraft" for purposes of the section 58c(a)(5) fee is improper.

In short, the fact that neither NJA nor anybody else issued travel documents to the guests on Marquis flights conclusively shows that the flights were not "commercial" for purposes of section 58c and thus did not incur the CUF.

**A.** **The Customs User Fee Statute and Regulation Preclude Treatment of the Marquis Flights as Commercial.**

CBP has no authority to demand a customs fee for a commercial flight other than the fee imposed by section 58c(a). "Notwithstanding any other provision of law . . ., during any period when fees are authorized under subsection (a) [the CUF provision], no charges, other than such fees, may be collected . . . for any . . . customs activity . . . in connection with the arrival or departure of any commercial . . . aircraft, or its passengers, crew, stores, material, or cargo, in the United States." 19 U.S.C. § 58c(e)(6); *see* Comp. Gen. Op. B-244345 (June 23, 1992) (explaining import of paragraph (e)(6)).[4] So CBP's implementing regulation, which relied solely on section 58c as the authority for fees, *see* 58 Fed. Reg. at 54,272 (original rule adopting the CBP regulations), cannot extend those fees beyond the scope of section 58c.

**1.** **The text and structure of section 58c unambiguously do not encompass these flights as "commercial."**

Understanding whether an aircraft is "commercial" must "begin[] with the language of the statute." *BASR P'ship v. United States*, 915 F.3d 771, 776 (Fed. Cir. 2019). Neither section 58c nor its implementing regulation, 19 C.F.R. § 24.22, defines the phrase "commercial aircraft." Accordingly, the phrase is given its ordinary meaning, *see, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *Bay Cnty., Fla. v. United States*, 796

---

[4] A different statute imposes a fee, apparently now administered by CBP, for immigration inspections. 8 U.S.C. § 1356.

F.3d 1369, 1375 (Fed. Cir. 2015), as informed by the statutory context in which the term is used, *see Yates v. United States*, 574 U.S. 528, 537 (2015).

The word "commercial" most naturally indicates that an aircraft is "intended to make money."[5] That begs the question, "intended" by whom?  Every use of an aircraft any aircraft, no matter how private or commercial—may generate revenue for many parties: the pilot that flies it, the mechanics that maintain it, the fuel supplier, the airport, and more.  That somebody makes money from the flights of an aircraft cannot, therefore, be enough to make the aircraft "commercial."  The term "commercial aircraft" must, in ordinary English, mean that the person who determines where it flies intends to make money by selling those flights.  Though CBP's interpretation does not receive *Chevron* deference, it is noteworthy that its interpretation has long been in accord with that common usage.  In 1986, CBP responded to an organization that transported doctors to volunteer for medical service in Mexico and wanted to know whether the flights incurred fees.  "Customs has consistently held that a 'commercial' aircraft is any civil aircraft being used in the transportation of persons for compensation or hire."  Ex. G.  CBP reasoned that "[b]ecause the pilot is being paid $200 *for each person transported*, the aircraft are considered commercial."  *Id.* (emphasis added).  The central feature that CBP noted there is missing here; NJA is not being paid more for each person transported, and a Marquis participant can bring as many or as few persons on the plane as she chooses.  Schirner Decl., ¶ 10.  CBP's observation to that volunteer organization is instructive: As NJA

---

[5] Cambridge Dict., https://dictionary.cambridge.org/us/dictionary/english/commercial.

pointed out above, it is fundamental to the commercial carriage of passengers that a person gets paid more for carrying more people.

Moreover, the participant directing a flight chooses the itinerary of a flight, including the origin, the destination, and the timing; ███████████████████████ ███████████████████████ Participants have complete discretion about who travels on the aircraft (subject to federal restrictions such as sanctions laws).  Schirner Decl., ¶ 10. And they cannot exercise that discretion in a commercial fashion, because they are ██████████████████████████████████████████████████████ ████ Ex. A2, ¶ B.2.

The context and structure of the statute remove any doubt that what qualifies an aircraft as "commercial" is the selling of seats to the passengers.  *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("A statutory provision 'that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'"); *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1357 (Fed. Cir. 2018) ("[S]tatutory '[a]mbiguity is a creature not of definitional possibilities but of statutory context.'") (second alteration in original) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). The statute specifies the circumstances when a person is obligated to collect the paragraph (a)(5) fee: "Each person that issues a document or ticket to an individual for transportation by a . . . commercial aircraft . . . shall—(A) collect from that individual the fee charged under subsection (a)(5) at the time the document or ticket is issued; and (B)

separately identify on that document or ticket the fee charged under subsection (a)(5) as a Federal inspection fee."  19 U.S.C. § 58c(d)(1).

Congress clearly meant "commercial aircraft" to be those for which the passengers receive tickets for transportation, because only a person that "issues a document or ticket" is required to collect the fee.  The subsection (d)(1) and (2) provisions precisely describe the only mechanisms for payment and collection of the subsection (a)(5) fee. Illustrating the care with which Congress crafted these provisions, paragraph (2) explains how to collect the fee when the paragraph (1) mechanism fails.  The application of paragraph (2) depends on the same precondition as paragraph (1): the issuance of an individual "document or ticket."  *Id.* § 58c(d)(2).  It is highly implausible that Congress created these detailed collection mechanisms but left them incomplete, with passengers owing a fee (due to traveling on a "commercial aircraft")[6] but having no way to pay it. Thus, if an aircraft's passengers do not receive individual tickets, it cannot be a "commercial aircraft" within the meaning of section 58c.

This structure, too, shows the Marquis flights are not "commercial" under section 58c.  NJA does not issue tickets or other documents to a participant's individual passengers for transportation on the aircraft.  Schirner Decl., ¶ 11.  A participant can travel alone, or invite whomever she chooses, up to the capacity of the aircraft.  *Id.*, ¶ 10. The participant must provide their identities to NJA, but NJA does not issue them tickets

---

[6] As noted above, *supra* n. 2, it really is the passengers that owe the fee.  *Compare Am. Airlines*, 551 F.3d at 1300 (interpreting 8 U.S.C. § 1356(d) ("[T]he Attorney General shall charge and collect $ 7 per individual for the immigration inspection of each passenger . . . ."), *with* 19 U.S.C. § 58c(a)(5) ("[T]he Secretary of the Treasury shall charge . . . for the arrival of each passenger aboard a commercial vessel or commercial aircraft . . . ."); *see also User Fee for Customs Services*, 58 Fed. Reg. at 54,279 ("[T]he intent of Congress was that the passenger . . . pay the fee.").

and has no communication with them before they arrive to board the plane. *Id.*, ¶¶ 10 – 11.

NJA maintains a flight manifest and basic information for submission to CBP and TSA, but those are not travel documents. CBP long ago determined that flight manifests are not individual travel documents within the meaning of section 58c. *User Fee for Customs Services*, 58 Fed. Reg. at 54,279 ("[T]he flight manifest cannot be used in the manner suggested by . . . commenters," namely "as the travel document.").

### 2. The CUF regulation unambiguously does not encompass these aircraft as "commercial."

The text and structure of 19 C.F.R. § 24.22, which details the section 58c fees, are similar as far as the commercial-aircraft fee is concerned. Like section 58c, section 24.22 does not define "commercial aircraft," and relies on the ordinary English meaning of the phrase. *See JBLU, Inc. v. United States*, 813 F.3d 1377, 1380 (Fed. Cir. 2016) ("The fact that a term is not defined by a regulation does not make it ambiguous," because "the words . . . are deemed to have their ordinarily understood meaning.") (citation omitted). Like section 58c, section 24.22 imposes the responsibility for collecting the fee on "[e]ach air or sea carrier, travel agent, tour wholesaler, or other party issuing a ticket or travel document . . . to the passenger." 19 C.F.R. § 24.22(g)(4)(i).

The significance of ticketing runs throughout section 24.22(g). For example, "a journey, which may encompass multiple destinations and more than one mode of transportation, will be deemed to originate in the location where the person's travel begins *under cover of a transaction which includes the issuance of a ticket or travel document* for transportation into the customs territory of the United States." 19 C.F.R. § 24.22(g)(1)(iv)

(emphasis added).  This provision would make no sense if an aircraft could be commercial, and a passenger owe a section 24.22(g) fee, without the passenger having a travel document at all.  As another example, "the term 'passenger' . . . includes an infant whether a separate ticket or travel document is issued for the infant or the infant occupies a seat or is held or carried by another passenger."  *Id.* at § 24.22(g)(1)(v).  This exception demonstrates the rule.  If the 24.22(g) fee applied regardless of whether the flight involves separate tickets for the passengers, CBP would not have had to specify that the fee applies to an infant without a separate ticket.[7]

In addition, when CBP adopted section 24.22(g), it carefully considered whether companies that do not issue tickets should be responsible for the fee, and decided they should not.  A common arrangement for commercial unscheduled flights is that a tour operator contracts for a charter carrier to operate a specified flight.  The tour operator markets the flight and sells seats to passengers, often in connection with a travel package to a vacation destination.  Commenters on section 24.22(g) urged that the carrier, rather than the tour operator, should be responsible for collecting the fee.  But in response, CBP stated quite clearly that the obligation rests with the tour operator because it issues the tickets.

- "Two commenters argued that charter airlines should be responsible for the remittance of fees collected by tour operators."  CBP responded:  "Since under the statute collection of the fees normally takes place when the transportation document

---

[7] Whether CBP can actually lawfully apply the CUF to infants without tickets is open to doubt, but is not at issue in this case.  The point is that, if a passenger's obligation to pay CUF were not generally dependent on having a ticket, CBP would not have had to create a special rule for infants in the first place.

or ticket is issued (in this case, by the tour operator), Customs has no authority to amend the regulations as suggested. . . ."  58 Fed. Reg. at 54,279.

- "Two commenters suggested that, in the case of charter operations, . . . tour operators would advise the carriers in writing via the manifests of the number of passengers . . . [and] that the flight manifest should be used as the travel document for purposes of determining when remittance of the fees is due." CBP responded:  "In view of the specific statutory requirements . . ., the flight manifest cannot be used in the manner suggested." *Id.*

- "One commenter stated that commercial air carriers prefer to have the option of collecting the fee in lieu of collection by U.S.-based tour wholesalers who contract for passenger space."  CBP responded:  "To the extent that the tour wholesalers issue the tickets . . ., Customs ***has no authority*** to provide in the regulations for collection of the fee by the carrier."  *Id.* (emphasis added).

- "In cases involving split charters whereby several tour operators charter space on one aircraft, one commenter suggested that the tour operator who contracts with the passengers, rather than the carrier, is in the best position to collect and remit the fees."  CBP agreed:  "If the tour operator issues the ticket or other travel document, the statute requires that the tour operator collect and remit the fees." *Id.*

- "One commenter pointed out that charter airlines already file quarterly reports with the U.S. Department of Transportation (DOT) and suggested that Customs review those quarterly reports to see if they would be sufficient for Customs purposes."  CBP responded:  "[I]nformation filed with the DOT . . . would not be sufficient in and of

itself because it only reflects passengers transported by carriers and thus would not provide complete information regarding fee collection ***which is based on ticket issuance rather than passenger arrivals***." *Id.* at 54,280 (emphasis added).

Having taken this position so vigorously (and correctly) when it adopted the regulation, CBP cannot now deny that the obligation to collect fees arises only if and when a company issues a passenger a ticket. *See United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 802 (Fed. Cir. 2020) ("This court will not defer to an agency's interpretation of a regulation when the evidence shows that 'the proffered interpretation runs contrary to the intent of the agency at the time of enactment of the regulation.'"); *see also* HQ 112511, 1993 U.S. Custom HQ LEXIS 12, *24 (Jan. 27, 1993) ("[C]ollection of the fee is dependent on . . . issuance of the ticket."). Indisputably, NJA issued the individual guest on Marquis flights no tickets or travel documents of any kind. Schirner Decl., ¶ 11.

Moreover, the principles that CBP adhered to in the rulemaking show that CUF does not apply in the first place to the Marquis flights. NJA did no more than the charter operators described above—indeed it does less, because it did not own the aircraft and the program participants directed the flights. Schirner Decl., ¶¶ 6, 7; Panchuk Certification; Ex. F5. CBP previously recognized that tour operators determine the status of a flight, because they sell the tickets. Here, the parties in the analogous position are the participants, who determine where and when a flight goes and who travels on the airplane. But unlike tour operators, they are not selling space on their flights. Ex. A2, ¶ B.2. Participants use program aircraft for their private purposes. In line with the divide between tour operators and charter carriers recognized in CBP's rulemaking, use by the

participants who direct the flights and decide the number of passengers determines these flights to be noncommercial.

### 3.  Interpreting section 58c(a)(5) to cover the Marquis flights would be unreasonable.

The fact that tickets or similar documents are the necessary element of a commercial flight is not just an accident of drafting.  It is central to the design and purpose of section 58c, and it would be unreasonable to impose the section 58c(a)(5) fee in the absence of tickets or equivalent documents even if the statutory language left the issue ambiguous.

Congress deliberately chose to establish two distinct fee regimes for air arrivals— private aircraft subject to an annual fee, and per-passenger fees on commercial aircraft. The reasons for that distinction are fairly evident.  Commercial aircraft naturally tend to demand a greater volume of services from CBP, precisely because of the sale of passage to the passengers.  An operator that is selling tickets to passengers increases revenue with every ticket sold, and will therefore push to carry as many passengers as possible.  The commercial nature of the operation means that the passenger volume will be high, and also that passengers will tend to arrive in large batches, as the operator schedules as many passengers as possible onto a given flight.  The operator will also schedule as many flights as possible given market demand and the requirements of maintenance. It makes sense, therefore, that Congress insisted on payment for customs services for commercial aircraft on a per-passenger basis.  To do otherwise would mean that a commercial aircraft operator could increase its passenger volume, as the sale of tickets gives it every incentive to do, without providing a corresponding increase in its payment for customs services.

In section 58c, Congress recognized this dynamic and established a corresponding arrangement with commercial airlines. They must charge to passengers the subsection (a)(5) fee, so that revenue to support CBP scales with commercial passenger traffic. And, in exchange, CBP must provide customs services at no additional cost (except a limited charge for overtime in certain circumstances for "charter air carriers," a group that does not include NJA, *see* Bradley Decl., ¶ 6; Ex. E5). 19 U.S.C. § 58c(e). The subsection (a)(5) fee presumably reflects Congress's rough estimate of the cost of these services. Congress did, after all, label it a "fee"—§ 58c(a)—a word that connotes a charge that corresponds to the cost or value of services provided. *See Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 341 (1974) ("A 'fee' connotes a 'benefit.'").

For private aircraft, the dynamic is the opposite. With private aircraft, there is no incentive—beyond whatever event is the occasion for a particular flight—to carry more passengers, or to increase travel on a particular route. The demand for customs services is sporadic—irregular and occasional in time, and unlikely to involve large batches of passengers. While each additional person on a private aircraft may require a marginal increase in customs services, Congress evidently concluded that this increase does not warrant, and is not worth the administrative burden of, collecting per-passenger fees. Instead the fee is set on an annual basis. The annual fee will surely be greater than the actual cost of the services provided if a private aircraft arrives from an international destination just once in a year, while it may be lower than the actual cost of services if the aircraft takes many international flights. The amount of the annual fee presumably reflects Congress's rough estimate of the cost of occasional customs services, in a way

that will work out in the aggregate.  Meanwhile, a private aircraft owner does not get the benefit of the bargain that Congress established for airlines.  If a private aircraft lands outside of normal hours, CBP may charge overtime for its services.  19 C.F.R. § 24.22(e); 19 C.F.R. § 24.16(c); 9 C.F.R. § 97.1(a)(1).

Given the nature of these two different fee regimes, the Marquis flights are squarely in the "private" category for CUF purposes.  NJA earns no revenue from program participants' added guests, and the guests themselves fly for free by the participants' invitation.  Likewise, participants use the aircraft for their own purposes, and not to earn revenue by selling tickets.  Unlike commercial aircraft operators, they have no incentive to add passengers and add flights, increasing traffic on a given route as much as the equipment and the market will bear.  They simply travel when and where their own plans dictate.  Their travel and their use of customs services are just as sporadic as any other private aircraft.  They do not generate large batches of passengers, as typical airline flights do.  The real cost of the services they use is similar to that of other private aircraft.  They should, consistent with Congress's design of the two-fee structure, face the same sorts of fees as other private aircraft owners.  To impose on program participants a per-passenger fee that was designed chiefly for regular airline operations would mean charging them more than Congress intended.

That NJA earns revenue from managing flight operations does not affect this analysis.  As noted above, multiple parties earn revenue from services provided in connection with a flight.  As far as the critical dynamic of section 58c is concerned—the sale of passenger seats that drives demand for customs services—NJA is a bystander in

the same position as a fuel provider, a caterer, a ground services provider, or any other service provider to an aircraft owner. NJA does not determine whether a given aircraft flies into a U.S. airport and how many passengers are aboard. Those decisions are wholly in the hands of program participants. That NJA earns revenue from managing and operating the aircraft makes no difference to the actual burden on customs services, and it should correspondingly not determine whether the aircraft are subject to the commercial-airline fee for those services.

For NJA or their participants to collect the subsection (a)(5) fee would be an additional departure from Congress's intentions for the program. It is striking that Congress not only required a carrier to collect the fee when it issues a ticket, but also specifically required the carrier to "separately identify" the fee, on the ticket, "as a Federal inspection fee." 19 U.S.C. § 58c(d)(1)(B). A carrier is not supposed to simply issue the ticket and absorb the fee into the price; the carrier is instructed to notify each individual passenger that he or she is paying a fee for federal inspection services. This communication to passengers must have been important to Congress; it is remarkable that in the context of simply collecting revenue, the statute regulates the content of passenger travel documents. Yet under CBP's audit, fees would be due for the Marquis flights even though there were no tickets at all, and thus no mechanism for informing passengers, who are not paying for their flights in the first place, that they are responsible for federal inspection fees. Thus, again, the absence of tickets or other travel documents shows the flights are not "commercial" within the meaning of section 58c.

Moreover, stretching the fee to cover the Marquis flights would defeat this part of the statutory purpose.

If there were any doubt remaining, it bears noting that CBP has long maintained the same interpretation that NJA advances here. "[C]ollection of the fee is dependent on . . . issuance of the ticket or travel document," CBP said in 1993. Ex. H., at p. 5. Yet in this case CBP insists that NJA collect the fee even though it does not (and nobody does) issue travel documents to the guests on Marquis flights. In 1992, the Office of Inspector General for the agency recommended that CBP obtain reports from the Department of Transportation about the number of passengers each airline transported to the United States. CBP responded that "the seller of an airline ticket, not the carrier which brings the passenger to the U.S., is responsible for collection and remission of [CUF]," and therefore "there is no direct correlation between the number of passengers flown into the U.S. and the fee liability of a given carrier." Ex. I., at p. 2. Yet remarkably, in this case CBP inquired how many individuals traveled on Marquis flights, and it never asked how many tickets were sold. Of course, CBP took those positions decades ago. But it has been consistent. In 2021, CBP considered the case of an airline that had collected CUF on certain flights, but on certain other flights, had simply carried passengers, on tickets sold by others. "[B]ecause National Airlines did not issue the tickets or travel documents for these flights" (and the companies selling the tickets had not forwarded the CUF for National Airlines to remit), "CBP *did not have authority* to seek remission of the subject CUFs from National Airlines." Ex. J., at p.3 (emphasis added).   In this case CBP

undertook to do something that, at the same time in the National Airlines case, it was

concluding it lacks authority to do.

### B.    CBP's Audit Improperly Relied on an Unrelated Definition of "Commercial" Status.

I  But section 122.1

does not implement section 58c, nor does section 24.22 incorporate section 122.1(d)'s

definition of "commercial aircraft." Thus, looking to section 122.1(d) to delineate

"commercial aircraft" for purposes of the section 58c(a)(5) fee is improper.[8]

Section 122.1(d) in the Air Commerce Regulations appears to have exerted a

magnetic pull on the auditor because it does include a definition of "commercial aircraft."

19 C.F.R. § 122.1(d). But the regulation explicitly limits the use of that definition: "The

following definitions apply in this part, unless otherwise stated." 19 C.F.R. § 122.1. It is

nowhere "otherwise stated" that the definition of "commercial aircraft" applies for

purposes of part 24, or specifically section 24.22 or its subsection (g) that implements the

---

[8] Even if the part 122 definition could apply, and could trump the scope unambiguously established by section 58c, the Marquis flights were not "commercial" within the meaning of part 122 anyway. The definition of "commercial aircraft" in section 122.1(d) has to be read in parallel with the accompanying definition of "private aircraft." "Private" means "any aircraft engaged in a personal or business flight . . . which is not . . . carrying passengers and/or cargo for commercial purposes." 19 C.F.R. § 122.1(h). There is no dispute that participants took Marquis flights for their own use. They do not invite their guests for "commercial purposes." And it cannot be said that NJA was carrying those passengers for "commercial purposes," because NJA received no money from the guests, had little to no prior communications with them, and gained no commercial benefits from carrying additional people. Thus, the Marquis flights were "private aircraft" under section 122.1, and the structure of part 122 means they could not simultaneously be "commercial aircraft."

section 58c commercial-aircraft fee.  Nor does section 122.1 purport to implement section

58c in any respect.  *See* 19 C.F.R. § 122.1 (Statutory Authority).

Meanwhile, there are extensive indications that when CBP adopted section

24.22(g), it did not mean to use the section 122.1(d) definition.  First, the choice to define

"commercial aircraft" in section 122.1(d) and not in section 24.22 is a clear signal that in

section 24.22 the term was not meant to have the same meaning.  *See Vt. Dep't of Natural*

*Res. v. United States ex rel. Stevens*, 529 U.S 765, 784 (2000).  In addition, the two regulations

are of nearly the same vintage. Section 122.1(d) was adopted in 1988.  53 Fed. Reg. 9,285

(Mar. 22, 1988).  Section 24.22(g) was originally adopted in an interim final rule in 1986,

and then substantially revised and finally adopted in 1992.  51 Fed. Reg. 21,152 (June 11,

1986) (IFR); 58 Fed. Reg. 54,271 (final adoption).  CBP had a straightforward opportunity to

incorporate the section 122.1(d) definition by reference into section 24.22(g) had it

intended them to have the same scope.  Indeed, CBP actually did incorporate one

definition from part 122, the definition of "scheduled airline." 19 C.F.R. § 24.22(g)(8)

(citing 19 C.F.R. § 122.1(k)).  By contrast, in the very same rulemaking, CBP chose not to

incorporate the part 122 definition of "commercial aircraft."  That different choice is a

powerful signal that CBP did not, when it wrote the regulation, intend the terms to have

the same meaning.

CBP has amended its regulations multiple times since the early 1990s, and it has

issued various decisions about collection of commercial-aircraft and commercial-vessel

fees.  It has never, so far as NJA has been able to find, previously suggested that section

122.1(d) determines the meaning of "commercial aircraft" for determining the scope of the section 58c(a)(5) fee.

In fact, in a 1993 decision, CBP Headquarters relied on principles just like these in refusing to interpret a term in section 24.24 based on its definition in a different regulation.  1993 U.S. Custom HQ LEXIS 2492, *12 (Oct. 28, 1993); Ex. K., at p. 4.  In that decision, the requester contended that the section 24.24 fee, imposed when a passenger "boards" or "disembarks" at a port, should not be based on cruise passengers temporarily departing from ships at layover ports, because 19 C.F.R. § 4.80a defines "board" and "disembark" to exclude layover ports.  1993 U.S. Custom HQ LEXIS 2492, *9.  CBP refused to rely on that definition.  *Id. at* *9-10.  Instead it insisted that because section 24.24 left the terms undefined, they must be interpreted in light of their function in the particular statutory and regulatory context.  *Id.*

Furthermore, CBP noted "evidence of Customs intent to limit the definitions of 'embark' and 'disembark' set forth in § 4.80a(a)(4)," in that "the first sentence of § 4.80a(a) which precedes these definitions . . . specifically states, 'For purposes of this section, the following terms will have the meaning set forth below[.]'"  *Id.* at *12.  Just so here, section 122.1 contains a similar limitation, which similarly must indicate that the section 122.1 definition of "commercial" is not relevant for CUF.  Second, in that 1993 case CBP noted that the terms have "different purposes" in the two regulations.  *Id.* at *10. Section 4.80a implements the passenger coastwise rule, which restricts the carriage of passengers on non-U.S. vessels; whereas section 24.24 is about the scope of a fee for use of ports.  *Id.*  So too here: "[C]ommercial aircraft" in section 24.22 is undefined, and CBP

cannot rely on the section 122.1(d) definition which is for a different purpose. Part 122 regulates operations, describing how to provide notice about an aircraft's arrival, which airports are eligible, and where an aircraft should go when it arrives. There is no particular reason that an aircraft directed to conduct operations in a particular way should incur the section 24.22(g) fee. Indeed, there are many part 122-commercial aircraft for which the section 24.22(g) fee is obviously irrelevant, because part 122 covers commercial cargo planes that have no passengers at all.

The discussion above is reason enough not to base a decision in this matter on section 122.1(d). It bears emphasis, moreover, that CBP cannot lawfully import the special meaning from section 122.1(d) to determine the scope of section 24.22(g) fees. *See Falconwood Corp. v. United States*, 422 F.3d 1339, 1349 (Fed. Cir. 2005) ("Because the government chose not to define [the term in the relevant regulation] . . ., we think it inappropriate to accord the terms anything more than their plain meaning.") (citing *Gould v. Gould*, 245 U.S. 151, 153 (1917)).

CBP's Counterclaim appears to suggest that the part 122 definition of "commercial" applies to part 24 simply because part 122 "applies to all air commerce." Counterclaim, ¶ 10 (quoting 19 C.F.R. § 122.0). In fact, CBP's observation illustrates the point that NJA is making: Words take meaning from their context. Part 122 explicitly covers the operations of aircraft that are "private" and not "commercial" under the part 122 definitions. For example, part 122 subpart C is entirely about "private aircraft." As another example, section 122.61 describes circumstances when "[p]rivate aircraft . . . are required to clear" the customs process. 19 C.F.R. § 122.61(a). Even more strikingly, section

122.14 says that when an airplane lands "outside the limits of a port of entry," the operator must pay "any added charges for inspecting the aircraft"—and then cites, as a chief example of those fees, the *private* aircraft fee.  19 C.F.R. § 122.14(b), (c) (each citing 19 C.F.R. § 24.22(e)).  These provisions are all, evidently, within "air commerce," which as CBP has noted is the scope of part 122.  So the fact that part 122 applies to "all air commerce" cannot decide whether a given flight is commercial or private, and cannot trump the explicit statement in section 122.1 about when the definitions apply.  And, more generally, "commerce" is evidently a concept of many meanings.  If an airplane or flight can be part of "air commerce" yet be "private" for purposes of part 122, surely a flight can be "commercial" for one purpose yet still be "private" for purposes of a different regulation—depending, as NJA has said, on the structure and context of the regulation at issue.

In short, the status of Marquis flights under part 122 simply cannot determine whether they are "commercial" for purposes of section 24.22(g), a different regulation with a different structure, purpose, and context.

## V.   ARGUMENT:  THE COURT SHOULD DISMISS THE GOVERNMENT'S COUNTERCLAIM.

The government has raised a counterclaim to enforce the liquidated damages notices, described above, and asking the Court to enter judgment against NJA for the amount of those demands.  ECF No. 23, at 6-12.  This counterclaim is due to be dismissed for lack of subject-matter jurisdiction.

The government asserted that the Court has jurisdiction under 28 U.S.C. § 1582(2).  But that is clearly incorrect.  Section 1582(2) confers jurisdiction on the Court for "any

civil action which arises out of an import transaction and which is commenced by the
United States . . . to recover upon a bond relating to the importation of merchandise."  28
U.S.C. § 1582(2).  "It is well established that the Court of International Trade does not have
jurisdiction pursuant to § 1582(1), . . . unless that action was commenced by the United
States," because the "opening words of this provision state" the phrase that the "action . . .
which is commenced by the United States."  *Playhouse Import & Export v. United States*, 18
C.I.T. 41, 46 (1994).

The word "action" means the case as filed by the plaintiff.  The Supreme Court
explained this with respect to 28 U.S.C. § 1441, the removal statute.  The statute says "any
civil action" for which a federal court would have jurisdiction may be removed by the
defendant.  *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1745 (2019).  The Supreme
Court held that the statutory word "action" is different from "claim."  Assessing whether a
court would have jurisdiction over the "action" means "whether the plaintiff could have
filed its operative complaint in federal court."  *Id.* at 1748.  "[A] counterclaim is irrelevant
to whether the district court had 'original jurisdiction' over the civil action."  *Id.*
Similarly, this Court's rules define how to "commence" an "action": "A civil action is
commenced by filing with the clerk of the court . . . a summons."  CIT R. 3(a).  NJA
commenced this action.  The United States did not.

Even if the United States had commenced this action, section 1582(2) describes
only civil actions that "arise[] out of an import transaction."  There is no sense in which
CBP's demands for liquidated damages arise out of an import transaction.  CBP has
processes for seeking relief regarding imports.  Part 175 "sets forth the procedures

applicable to requests by domestic interested parties for the classification and rate of duty applicable to designated imported merchandise." 19 C.F.R. § 175.0.  Part 171 "relat[es] to petitions for relief from fines, forfeitures, and certain penalties incurred, and petitions for the restoration of proceeds from sale of seized and forfeited property." 19 C.F.R. § 171.0.  It explicitly excludes "petitions on claims for liquidated damages or penalties which are guaranteed by the conditions of the International Carrier Bond," *id.*—which is precisely the bond that is at issue here.  Thus, CBP's own regulations distinguish these liquidated damages from import transactions.

So CBP's counterclaim cannot satisfy the basic prerequisites for any section 1582 jurisdiction.  It also does not satisfy the conditions for paragraph (2), namely that CBP is seeking to "recover on a bond relating to the importation of merchandise."  NJA is not in the business of importing merchandise, and the government does not even allege that CBP's damages demand relate to importation of merchandise.   Counterclaim, ¶ 1 (jurisdictional allegation).

Nor can the government invoke any other source of jurisdiction.  The Court does not have the sort of broad supplemental jurisdiction that district courts do. *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1052-54 (Fed. Cir. 2012) (rejecting 28 U.S.C. § 1367 as a basis of jurisdiction, and also 28 U.S.C. § 1585).  The Court's supplemental jurisdiction is limited to counterclaims and cross-claims "involv[ing] the imported merchandise that is the subject matter of such civil action," or "is to recover upon a bond or customs duties relating to such merchandise." 28 U.S.C. § 1583.  There is, in this case, no "imported merchandise."  The court has previously interpreted "merchandise" to

include goods and services; but even so, the services have to be "imported," i.e. "brought into the country from a foreign or external source." *Cormorant Shipbuilding Co. v. United States*, 33 C.I.T. 440, 446 (2009) (holding that vessel repairs performed abroad are "imported merchandise" when CBP assesses duties on the repairs at the time of importation).  That reasoning cannot stretch so far as to encompass a person's travel on an airplane as "imported merchandise."

## VI.   ARGUMENT:  IF THE COURT DECIDES THE MERITS OF THE GOVERNMENT'S COUNTERCLAIM, IT SHOULD GRANT SUMMARY JUDGMENT TO NJA.

Section 113.64 obligates a carrier, under the terms of its bond, to pay liquidated damages if the carrier did not remit fees.  This bond obligation must be limited to situations in which the carrier was obligated to collect fees.  This is evident in the structure of section 113.64(b).  It triggers the bond condition "[i]f the principal (carrier) fails to pay passenger processing fees" in a timely fashion.  19 C.F.R. § 113.64(b).  Suppose a tour operator or other person commissioning a flight was responsible for collecting and remitting the fees.  That situation is not uncommon, and CBP intentionally drafted section 24.22(g) to encompass this possibility. *See supra* at p. 20 and n.2 (quoting 58 Fed. Reg. 54,279-80).  In that case, the carrier would never pay the passenger fees, because the ticket-issuing party would remit them.  19 C.F.R. §§ 24.22(g)(4) and (5) ("Payment of the fees must be made . . . [by] the air or sea carrier, travel agent, tour wholesaler, or other party . . . which issue[d] a ticket or travel document.").  If the bonding regulation meant that the carrier has to pay liquidated damages solely because the carrier did not remit fees, the carrier would then pay double the fee amounts, *see* 19 C.F.R. § 113.64(b) ("Two times the passenger processing fees"), even though CBP was also receiving the fees from

the tour operator. The bonding regulation cannot be read to produce that result. Consequently, section 113.64(b) can only impose liquidated damages when a carrier fails to remit fees that the carrier itself was supposed to collect.

Nothing in the rule that adopted the current version of section 113.64(b) suggests anything other than this sensible approach. *See* 80 Fed. Reg. 70,154 (Nov. 13, 2015). And any interpretation under which CBP attempts to require a carrier to effectively stand as surety even when it was not obligated to collect section 58c(a)(5) fees would render that rule arbitrary and capricious, and in excess of CBP's authority given how firmly CBP has stated that it cannot require carriers to remit fees if they did not issue the tickets.

NJA issued no tickets or other travel documents to the guests on Marquis flights, and CBP has no evidence suggesting it did.  Section 58c(d) and CBP's CUF regulation, 19 C.F.R. § 24.22(g), require only a person that issues tickets to collect and remit fees. Accordingly, the bond condition does not apply to NJA.

More fundamentally, the surety bond conditions in section 113.64 are likely beyond CBP's authority to begin with.  The lack of jurisdiction noted above is not a technical accident.  It is a signal that CBP's use of bonding conditions to get around the congressional design of section 58c is improper in the first place.  Had Congress intended that section 58c would become a liability of a flight's operator, it would just have said so; and the customs laws provide mechanisms to recover from those who fail to pay duties that they owe.  Congress evidently also understood that CBP would impose surety bonds for importation of genuine merchandise.  That it did not allow jurisdiction for counterclaims like the one in this case reveals that Congress did not contemplate CBP

would impose a surety bond for a liability that Congress had so explicitly and deliberately placed elsewhere.  Congress's choice to impose the CUF liability directly and solely on passengers was deliberate; and CBP does not have the authority to legislate around it by requiring carriers to agree to accept the liability.  That said, the Court need not reach this issue because it can decide the case on the grounds set forth above.  NJA reserves its contention that the surety bond condition exceeds CBP's authority, in case the case proceeds beyond this motion.

## VII.  **CONCLUSION**

For these reasons, the Court should determine and declare that NJA was not obligated to collect CUF on the Marquis flights, and that CBP's determination that it was so obligated was incorrect.  The Court should dismiss the government's counterclaim for liquidated damages for lack of jurisdiction; but if it concludes it does have jurisdiction, it should grant NJA summary judgment on the merits of the counterclaim.

Dated this 8th day of June, 2022.

Respectfully submitted,

*/s/ Keith Bradley*
*Keith Bradley*
ScheLeese Goudy
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
(303) 830-1776
(303) 894-9239 (facsimile)
Email: keith.bradley@squirepb.com
Email: scheleese.goudy@squirepb.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I certify that this response complies with the volume limitation of Judge Claire R. Kelly's Chambers Procedures, section 2(B)((1)(a) because it contains 11,414 words according to the count of Microsoft Word.

*/s/ Keith Bradley*
KEITH BRADLEY

**CERTIFICATE OF SERVICE**

I certify that on June 8, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of International Trade by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Keith Bradley*
KEITH BRADLEY